1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

8

9  UNITED STATES OF AMERICA,

Plaintiff,

vs.

ROSE BURTON,

Defendant.

Case No.: 16-CR-1248-GPC

**ORDER GRANTING MOTION TO SUPPRESS STATEMENTS**

[ECF No. 14]

10
11
12
13
14
15
16

17      On March 2, 2016, Defendant Rose Burton was arrested following the

18  discovery of methamphetamine in a vehicle that she drove across the United

19  States/Mexico border at the San Ysidro port of entry. Following her arrest, she

20  invoked her right to remain silent. Approximately ten days earlier, on February 20,

16cr1248-GPC

2016, Burton had provided a statement to FBI agents investigating the kidnapping of Zayki Sandoval. Defendant moves to suppress the February 20th statement as being involuntary and made without Miranda warnings. Def. Mot., ECF No. 14. The United States has opposed. Gov't Opp., ECF No. 20. An evidentiary hearing was held on September 27, 2016.  Upon consideration of the moving papers, applicable law and argument of counsel, and for the reasons set forth below, the Court hereby **GRANTS** the motion to suppress.

## BACKGROUND

### A. The Kidnapping of Zayki Sandoval

On February 17, 2016, the step-father of Zayki Sandoval contacted the Oceanside Police Department ("OPD") to report that a threatening note was left at his home and that shots were fired at his house the night before. The note read "Give us the money, you dirty bitch" and on the back it said "or there will be consequences." Transcript of Mot. to Suppress Hear'g (Sept. 27, 2016) ("Transcript"), ECF No. 25 at 24. The step-father also reported that Burton had come to his house on February 16, at which time Jose Jimenez, aka "El Primo," said to Burton, "I know you have our stuff . . . I know you picked it up . . . we want it." *Id*. at 25.

On the morning of February 20, 2016, Sandoval's step-father reported to the OPD that Sandoval had been kidnapped and was being held for ransom in Tijuana,

1    Mexico. The step-father stated that he had received demands to pay $30,000 for the

2    release of Sandoval for a drug debt that she owed. Later that day, OPD contacted

3    the FBI to request their assistance in the kidnapping investigation. FBI Special

4    Agent Murray arrived at the scene at approximately 1:45 pm and was briefed on

5    OPD's investigation. Agent Murray was informed of the shooting, the threatening

6    note, and El Primo's statements to Burton. *Id*. 24-26. Agent Murray was also told

7    by OPD that "El Primo" was a known drug trafficker. *Id*. at 45. After speaking

8    with OPD, Special Agent Murray identified Burton as a likely "associate" of

9    Sandoval. *Id.* at 11-12, 27. As a result of what he learned, Murray placed a look out

10    in the TECS system (Treasury Enforcement Communications System) for Burton,

11    to request that she be stopped upon any attempted entry to the United States. *Id*. at

12    26-27.

13          **B. Burton is Questioned by the FBI**

14         On February 20, 2016, at approximately 10:13 pm, Burton entered the

15    United States from Mexico through the San Ysidro point of entry. Burton Decl.,

16    ECF No. 14-2 at ¶ 2. Based on the TECS alert requested by FBI Special Agent

17    Murray, Burton was referred to secondary inspection. At secondary inspection,

18    Burton was removed from her car, handcuffed, and escorted into the security

19    office. *Id*. ¶¶ 6-7. Upon arriving at the security office she was subjected to a pat-

20    down search. During the search, two small personal-use baggies of

16cr1248-GPC

methamphetamine were found on her person. *Id.* ¶¶ 11-12. Burton was then seated on a bench and her ankle was shackled to the bench. *Id.* ¶ 13. While she was shackled to the bench, Customs and Border Protection ("CBP") agents continued to search her car. *Id.* ¶ 15. In the course of the search, the agents found marijuana in a lock box in her car. *Id.* ¶ 16. After Burton had been in the security office for approximately one hour, agents confronted her with the marijuana they had found. *Id.*

Around midnight on February 21, 2016, Burton was unshackled from the bench, and escorted to an interview room in the security office. FBI Special Agents Murray and Brandon Cagle arrived at the San Ysidro Port of Entry just after midnight. Murray Decl. at ¶ 5, ECF No. 20-1. Before interviewing Burton, Agent Murray spoke with Customs and Border Protection officers who informed him that, during a pat-down of Burton, the officers had discovered a personal-use amount of methamphetamine on Burton's person as well as some marijuana in a lockbox in her car. *Id.* The officers told Murray that Burton was not under arrest and that the seizure of the drugs would be handled administratively, not criminally. *Id.* The officers also told Murray that Burton would only be fined, and then processed out, after the interview was completed. *Id.*

At around 12:15 am, FBI Special Agents Murray and Cagle entered the interview room in plain clothes and without any visible arms. Burton was not

handcuffed or otherwise restrained during the interview. *Id.* The demeanor of the agents was calm and professional. *Id.* ¶ 7. The agents did not give *Miranda* warnings to Burton prior to the interview. *Id.* ¶ 6.

At the beginning of the interview, Agent Murray asked Burton if she knew why the FBI agents were there. *Id.* ¶ 8. Burton responded that she thought they were there due to the drugs found on her and in her car. *Id.* Agent Murray informed Burton that they were not there to talk about the drugs and that they were not concerned about the drugs. *Id.* Instead, Agent Murray indicated that he wanted to talk to her about her friend Zayki Sandoval. Agent Murray informed Burton that they were only interested in Sandoval's safe return to the United States.

For her part, Burton states that the FBI agents, at the beginning of the interview, "told [her] that they knew what [she] had been doing and that they did not want to talk to [her] about that." Burton Decl. at ¶ 22, ECF No. 14-2. Burton understood that the agents knew that she had been involved with drug smuggling. *Id*. She also acknowledged that the agents had told her that what she had done was not important and that they only wanted the safe return of Sandoval. *Id*.

Because the agents knew little about the events that had transpired leading up to the purported kidnapping of Sandoval, the interview was led largely by Burton volunteering information about what had taken place. Murray Decl. at ¶ 9, ECF No. 20-1. Based on Burton's statements, the agents asked follow-up questions

1    in order to get a better handle on what had transpired.  Transcript, ECF No. 25 at

2    12. According to the agents, their purpose in interviewing Burton was to learn as

3    much as they could about Sandoval, her location, who was holding her, and any

4    other information that could be passed on to the Mexican law enforcement officers

5    working on the case. *Id*. at 12-13. During the interview, however, Burton also

6    provided information about a delivery of large quantities of methamphetamine that

7    she had brought to a hotel room in San Marcos, California.

8          At some point during the interview, Agent Murray informed Burton that she

9    was not under arrest and was not going to be arrested for the drugs found on her

10   that night. Murray Decl. at ¶ 10, ECF. No. 20-1. During the evidentiary hearing,

11   Agent Murray testified that he recalled advising Burton of these facts towards the

12   end of the interview and could not say if he had done so earlier. Transcript, ECF

13   No. 25 at 48. It was also towards the end of the interview when Agent Murray

14   informed Burton that he had talked to CBP and that Burton would be

15   administratively processed out, and that she would be free to leave the port of

16   entry. *See id.*

17         The interview lasted approximately 45 minutes to 1 hour. *Id*. at 10. Burton

18   did not appear to be under duress or under the influence of drugs or alcohol, and

19   appeared coherent. Transcript, ECF No. 25 at 14-15. According to Agent Murray,

20   Burton never asked about an attorney during the interview and that if she had, the

6

1    questioning would have stopped. Murray Decl. at ¶ 11, ECF No. 20-1; Transcript,

2    ECF No. 25 at 14 & 41. Burton, on the other hand, claims that she asked whether

3    she should have an attorney present prior to the questioning. Burton Decl. ¶ 28,

4    ECF No. 14-2.

5         Burton has declared that she did not feel free to leave the interview. *Id.* ¶ 23.

6    She was alone in the room with the agents and immediately prior to the

7    questioning had been shackled to a bench. *Id.* Her identification, car, and keys

8    were in the possession of agents. *Id.* Burton further declared that she believed that

9    she needed to speak with the agents or she would not be allowed to leave. *Id.* ¶ 24.

10   She did not understand that any statements she made could later be used against

11   her. *Id.* ¶ 26. She believed that if she was cooperative with the FBI agents and that

12   if she assisted them with the return of Sandoval, her statements would not be used

13   against her. *Id.* ¶ 27.

14        Once the interview concluded, Burton returned to the security bench for

15   processing of paperwork. After the administrative process was complete, Burton's

16   keys and wallet were returned to her, she was released, and she left the security

17   office and went on her way. After the interview, Agent Murray asked for the TECS

18   alert that he had requested for Burton to be taken down. Murray Decl. ¶ 13, ECF

19   No. 20-1. He did not open an investigation into Burton based on her statements

20   about methamphetamine distribution. *Id.*

A few days after the interview, Burton contacted Murray to report that Sandoval had been released, but was still in Mexico. Transcript, ECF No. 25 at 6-7. Then, on February 27, 2016, Burton informed Special Agent Murray that Sandoval had returned to the United States successfully. *Id*. After confirming that Sandoval was safely in the United States, the investigation wound down. *Id.* at 18.

**C. Arrest**

On March 2, 2016, Burton entered the United States through the San Ysidro Port of Entry as the driver and sole occupant of a Ford Focus. Burton Decl. ¶¶ 1-2. The CBP officers referred the vehicle to secondary inspection based on a TECS alert different than the one requested by the FBI. *See* Gov't Opp., ECF No. 20 at 2. Thereafter, a CBP Canine Enforcement Officer performed a canine sniff of the vehicle, which produced an alert to the rear seat of the car. *Id.* A CBP officer partially pulled the felt from the rear seat and observed what appeared to be the edge of a vacuumed sealed package. *Id.* The vehicle was then screened using a Z-Portal x-ray which revealed anomalies in the rear quarter panels and rear backseats of the car. *Id.* Following an inspection of the inside of the car, officers discovered and seized 25 packages containing approximately 17.28 kilograms (38 pounds) of methamphetamine. *Id.* at 3.

**D. Procedural History**

On March 2, 2016, Burton was charged in a complaint with one count of

8

importation of methamphetamine. On March 29, 2016, a single count information

was filed in case number 16cr0626-GPC, charging that Burton did "knowingly and

intentionally import a mixture and substance containing a detectable amount of

methamphetamine . . . ." Burton entered a not guilty plea to the information.  On

June 1, 2016, the government filed the current indictment. ECF No. 1. Count 1

charges Burton with conspiracy to distribute 500 grams or more of a mixture and

substance containing methamphetamine. Count 2 charges that on March 2, 2016,

Burton imported 10.85 kilograms of methamphetamine.

### DISCUSSION

**A.      The Need for *Miranda* warnings**

Burton moves to suppress her February 20th statement made to Special

Agents Murray and Cagle because it was the product of custodial interrogation and

was not preceded by *Miranda* warnings. Burton argues that she was placed in

custody when agents shackled her to a bench in a locked security office,

confronted her with methamphetamine and marijuana found in her possession,

escorted her to the interview room, maintained custody and control of her driver's

license and car, and then placed her in a room with two FBI agents who proceeded

to question her. She continues that the questioning of the FBI agents constituted

interrogation based upon the Government's knowledge of her connection to illicit

drug activities.

16cr1248-GPC

1    The Government opposes, asserting that Burton was not in custody because

2  she was going to be administratively processed for possessing user-quantities of

3  drugs and because the FBI agents were merely soliciting her assistance in locating

4  Sandoval, the victim of a kidnapping, not interrogating her within the meaning of

5  *Miranda*.

6  **1.  Custody**

7   "An officer's obligation to administer *Miranda* warnings attaches . . . "only

8  where there has been such a restriction on a person's freedom as to render him 'in

9  custody.'"" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*)

10  (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*)). Whether a

11  suspect is in custody turns on whether there is a "'formal arrest or restraint on

12  freedom of movement' of the degree associated with a formal arrest." *California v.*

13  *Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (quoting *Mathiason*, 429 U.S. at

14  495). This inquiry requires a court to examine the totality of the circumstances

15  from the perspective of a reasonable person in the suspect's position, *see Berkemer*

16  *v. McCarty*, 468 U.S. 420, 442 (1984), and focuses on the objective circumstances

17  of the interrogation, not the subjective views of the officers or the individual being

18  questioned, *Stansbury*, 511 U.S. at 323. As such, the court must determine whether

19  "the officers established a setting from which a reasonable person would believe

20  that he or she was not free to leave." *United States v. Beraun–Panez*, 812 F.2d 578,

10

580 (9th Cir. 1987), *modified by* 830 F.2d 127 (9th Cir. 1987). To conduct this analysis, five non-exhaustive factors are considered: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

In the instant case, Burton was told to get out of her car, handcuffed, and escorted into the security office where she was subjected to a pat-down search, which resulted in the seizure of two baggies of methamphetamine from her person. Burton was then seated on a bench and her ankle was shackled to the bench for more than one hour. A car search revealed marijuana in a lock box in her car and Burton was confronted with the marijuana. Immediately prior to the interview, Burton was unshackled from the bench, and escorted to an interview room in the security office.

The above demonstrates that the CBP officers used commands to summon Burton; confronted her with the methamphetamine and marijuana that was found on her person and in her car; and placed significant restraints on her freedom. Until the time that the FBI agents arrived, these happenings would have caused a reasonable person to believe that they were being subjected to more than the "temporary detention occasioned by border crossing formalities." *United States v.*

16cr1248-GPC

1  *Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001).[1]

2      Meanwhile, the Government focuses on the events that transpired after the

3  FBI agents contacted Burton and argues that those facts weigh heavily against a

4  finding of custody. The Government points out that the FBI agents did not confront

5  Burton with the drugs found on her person and in her car and, in fact, that they had

6  told her that they were not interested in those drugs. In addition, the actual

7  interview took place in an interview room wherein Burton was not handcuffed or

8  shackled. The Government also notes that the agents did not pressure Burton.

9      The parties have compartmentalized their inquiries regarding the

10  circumstances bearing on custody. Defendant focuses on the actions prior to the

11  interview and the Government focuses on those that occurred after Burton was

12  accompanied to the interview room. Yet in considering the totality of the

13  circumstances relating to the detention, the Court must necessarily consider all of

14  the facts from the time that Burton was detained based on the TECS alert until the

15  time of the interview. As of the time that the FBI agents had arrived at the port of

16  entry, the objective facts demonstrate that Burton was in custody. The remaining

17  _____

18  [1] The Government argues that detention during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment. *United States v. Espericueta-Reyes*, 631 F.3d 616, 622 (9th Cir. 1980) ("so long as the searches are conducted with reasonable

19  dispatch and the detention involved is reasonably related in duration to the search, the detention is permissible under the Fourth Amendment."). The Court disagrees that Burton's detention was routine.  Here, the search of Burton's person and car had long occurred by the time that the

20  interview with the FBI occurred. The additional detention to interview Defendant, therefore, was not supported as a border search.

issue, thus, is whether the actions of the FBI agents removed Burton from the coercive environment that had been created such that a reasonable person would have believed they were not free to leave at the time of the FBI interview.

Relying on *Mathiason*, the Government asserts that Burton was not restrained because she was told she would be free to leave after she was administratively processed. In *Mathiason*, Defendant was questioned in a closed room in the office of a law enforcement agency. *See* 429 U.S. at 493-94. Although taking place in an admittedly "coercive environment," the questioning, there, was found not to amount to custodial interrogation because the defendant had been told that he was not under arrest and that he was free to leave, and thereafter he left without hindrance. *See id*. at 494-95.

The Government additionally relies on *United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2004) (en banc) to support their position. In *Crawford,* the defendant's home was subjected to a parole search and, thereafter, an FBI agent asked defendant whether he, the defendant, would voluntarily travel to the FBI offices for an interview. At the FBI offices, Crawford was told that he was not under arrest and that he was free to go. The defendant was, moreover and in fact, returned home at the end of the interview, without being arrested. The Ninth Circuit observed in *Crawford* that "[b]eing aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the

questioning was noncustodial." *Crawford*, 372 F.3d at 1060. The court, therefore, concluded that Crawford's interview at the FBI offices was noncustodial because Crawford had been aware of the freedom to depart and had, in fact, departed after questioning at the law enforcement office.

Here, the record does not support the Government's suggestion that Burton was aware that she would be administratively processed, because that information was not communicated to Burton at the outset of the interview, as was the case in *Crawford*. Instead, Agent Murray testified that he recalled advising Burton that she would not be arrested near the end of the interview, and he could not recall "if it was done before that." Transcript, ECF. No. 25 at 48.

The Supreme Court has recognized that an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment of whether an individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave. *Stansbury*, 511 U.S. at 325-26. The Government points out that the agents made clear to Burton that they were not interested in questioning her about the personal-use amounts of drugs that she possessed and that they were only investigating the whereabouts of her friend. Moreover, she was not

14

1    handcuffed or told she was under arrest.

2         Notwithstanding, the key issue before the Court is not just whether or not the

3    setting Burton was interviewed in was coercive, but whether there was a sufficient

4    break from the custodial setting that had already been established. While *Crawford*

5    demonstrates that subsequent events can change the custodial status of an

6    individual, the Government has failed to establish that such a change had occurred

7    at the time that the FBI interview commenced. Unlike *Crawford*, there was no

8    temporal break or change in location, here, to let Burton know that the custodial

9    detention had ended. Burton was not told that she was free to leave at the

10   beginning of the interview. By the time that the FBI agents had arrived, Burton had

11   already been detained for two hours. Because the officers did nothing to establish a

12   setting from which a reasonable person could believe that they were free to leave

13   once the interview began, Burton's custody remained continuous throughout her

14   time at the port of entry.

15        The FBI agents could have established a clean break from Burton's previous

16   custodial situation if they had advised Burton at the outset that she was not under

17   arrest and that she would be administratively processed and released.  Instead, the

18   Government relies on the fact that Burton was not placed under arrest, that her

19   restraints were removed at the time of the interview, and that she knew that the FBI

20   agents were not interested in the user-quantity of drugs that Burton had possessed,

15

to demonstrate that she was not in custody. Ultimately, however, the Court concludes that these facts do not establish a sufficient break from the earlier detention from the perspective of a reasonable person in Defendant's position. Accordingly, the Court concludes that Burton was in custody at the beginning of the FBI interview prior to any questioning.

### B.   Interrogation

The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467.

A primary purpose of *Miranda v. Arizona* was "to give concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U.S. at 441-42. With that end in mind, the Supreme Court has observed that "[o]ne of the principal advantages' of *Miranda* is the ease and clarity of its application." *Berkemer*, 468 U.S. at 430.

The Court's research of this matter did not result in any case similar to the present one. Certainly, this case does not involve the archetypal *Miranda*-like

16cr1248-GPC

1  situation where law enforcement officers are interviewing someone that they

2  believe has committed a crime and are asking questions regarding the investigated

3  crime. What is more, those cases in the Ninth Circuit that have addressed the

4  "interrogation" issue outside of the typical *Miranda* scenario, do so in the context

5  of immigration cases where undocumented detainees are asked routine

6  biographical information that can become relevant to prosecution under the

7  immigration laws.

8       In one immigration case, the Ninth Circuit framed the test to determine

9  whether questioning is "interrogation" within the meaning of *Miranda* as whether

10  "under all of the circumstances involved in a given case, the questions are

11  'reasonably likely to elicit an incriminating response from the suspect.'" *United*

12  *States v. Mata–Abundiz*, 717 F.2d 1277, 1278-79 (9th Cir.1983) (quoting *United*

13  *States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981) (quoting *Rhode Island v. Innis*,

14  446 U.S. 291, 301 (1980) (dialogue between the two officers to which no response

15  from the respondent was invited did not constitute "interrogation.")).

16       In *Mata–Abundiz*, an Immigration and Naturalization Service ("INS")

17  criminal investigator questioned Mata while he was in jail on state criminal

18  charges for possession of a firearm by an illegal alien, among other crimes. 717

19  F.2d at 1278. The INS investigator characterized his jail visit as a routine civil

20  investigation. *Id*. During that visit, he asked Mata his citizenship and did not

17

1    administer any *Miranda* warnings. *Id*. Mata responded by stating that he was a

2    citizen of Mexico. *Id*. The investigator then went to his office and made further

3    inquiries into Mata's immigration status. *Id*. Within three hours, he returned to the

4    jail with a warrant for Mata's arrest. A few days later, Mata was charged with the

5    federal offense of possession of a firearm by an illegal alien. *Id*. Mata's unwarned

6    statement to the investigator was the only evidence presented at trial to show his

7    alienage. *Id*. Under these facts, the Ninth Circuit held that the INS investigator's

8    questioning of Mata at the jail amounted to an "interrogation" under *Miranda*,

9    because the investigator had reason to know that his questions were likely to elicit

10   incriminating information relating to a federal prosecution for illegal possession of

11   a firearm by an alien. *Id*. at 1279.

12        Here, the FBI agents knew or believed that (1) Sandoval was a drug

13   trafficker; (2) that Sandoval was kidnapped by drug traffickers; (3) that the same

14   day that shots were fired at Sandoval's house, Burton had been accused by a drug

15   trafficker of having his "stuff" and that she had "picked it up." These facts show

16   that FBI Special Agent Murray had reason to believe that Burton possessed

17   distribution quantities of drugs and was a drug associate of Sandoval. Moreover,

18   rather than asking specific questions regarding the whereabouts of Sandoval, Agent

19   Murray asked open-ended questions and follow-up questions about Sandoval

20   which were likely to elicit an incriminating response regarding Burton's and

18

Sandoval's drug trafficking activities leading up to Sandoval's kidnapping.

On the other hand, it is clear that at the time the agents interviewed Burton they did not intend to use the coercive nature of confinement to extract a confession. The facts show that: (1) Burton was not a target of the kidnapping investigation; (2) the FBI was not investigating Burton or Sandoval for drug trafficking; (3) the FBI was not coordinating with CBP officers in any drug trafficking investigation; (4) the sole purpose of the interview was to develop information on the whereabouts of Sandoval; (5) the purpose was clearly communicated to Burton; (6) true to their word, the FBI did not investigate Burton or pass on admissions to CBP officers; (7) the questions posed were not accusatory; and (8) the FBI agents did not expect Burton to cross drugs into the United States ten days later or expect her responses to questions at the February 20 interview to incriminate her in a prosecution investigated by a separate agency.

Cases involving questioning during civil tax investigations are instructive in sorting through these competing facts. In *United States v. Mathis*, 391 U.S. 1, 4 (1968), the Government sought to escape application of *Miranda* warnings on two grounds: (1) that the questions asked were part of a routine tax investigation where no criminal proceedings might even be brought, and (2) that the defendant had not been put in jail by the officers questioning him, as the defendant was being held on an entirely separate offense. The Supreme Court, however, found that these

1    differences were too minor and shadowy to justify a departure from the well-

2    considered conclusions of *Miranda* with reference to warnings to be given to a

3    person held in custody. Stated differently, the *Mathis* court found nothing in the

4    *Miranda* opinion called for a curtailment of the warnings to be given persons under

5    interrogation by officers based upon the reason why the person was in custody. *Id*.

6    at 4-5.

7            Likewise, here, the fact that the FBI agents were not investigating Burton

8    and were asking her questions as part of a routine kidnapping investigation would

9    not alone make *Miranda* inapplicable.

10           In deciding whether particular police conduct is interrogation, the Supreme

11   Court has observed that "we must remember the purpose behind our decisions in

12   *Miranda* and *Edwards:* preventing government officials from using the coercive

13   nature of confinement to extract confessions that would not be given in an

14   unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987). In

15   *Mauro*, in concluding that the government had not interrogated the defendant, the

16   Supreme Court observed: "Mauro was not subjected to compelling influences,

17   psychological ploys, or direct questioning. Thus, his volunteered statements cannot

18   properly be considered the result of police interrogation . . . The government

19   actions in this case do not implicate this purpose in any way." 481 U.S. at 529-30.

20           Yet in the instant case, unlike in *Mauro*, Burton was subjected to the

20

coercive nature of confinement and was subjected to questioning that was likely to produce incriminating responses. The admissions were the product of government actions that squarely implicated the purposes of *Miranda*. Accordingly, under all of the circumstances of the case, the Court concludes that the FBI agents "interrogated" Burton within the meaning of *Miranda* because the agents posed open-ended questions that were reasonably likely to elicit an incriminating response from her.

## C.     Voluntariness of Burton's Statement

The Court must assess the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). An involuntary confession violates the Due Process Clause of the United States Constitution and is inadmissible. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

Section 3501(b) of 18 U.S.C. sets forth five factors which a court must review to determine whether a statement is voluntarily made. These factors

21

1    include: (1) the time elapsing between arrest and arraignment of the defendant; (2)

2    whether the defendant knew the nature of the offense with which she was charged

3    at the time of making the confession; (3) whether the defendant was aware that she

4    was not required to make any statement and that any such statement could be used

5    against her; (4) whether the defendant had been advised of her right to counsel; and

6    (5) whether counsel was present at the time of defendant's confession. 18 U.S.C.

7    § 3501(b); *United States v. Shi*, 525 F.3d 709, 730 (9th Cir.2008). No one factor is

8    necessarily conclusive on the issue of the voluntariness of a confession. *Id.*

9          With respect to the § 3501(b) factors, the Court notes, first, that there was no

10   delay between arrest and arraignment since Defendant was not arrested following

11   her detention and FBI interview. Second, Burton was informed by the agents

12   during the interview that she would not be criminally charged for possessing drugs

13   and, instead, that she would be administratively processed.

14         Meanwhile, Burton was not given *Miranda* rights, including necessarily the

15   right to remain silent or the right to the presence of counsel during the interview,

16   and no attorney was present when she gave her statement to the agents.

17   Nonetheless, there is also no evidence that any of the statements made by Burton

18   were extracted by use of threat, violence, or psychological pressure. Instead, the

19   statements were provided so as to assist the FBI in a kidnapping investigation.

20         Burton asserts that the various factors here — the handcuffs and shackles,

16cr1248-GPC

the isolation, and the threat of future prosecution — show that Burton's statements were not "the product of an essentially free and unconstrained choice." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (quotations omitted). Instead, she claims that the FBI infused the interrogation with compulsion that propelled her to make the February 20th statements.

While the Court finds that Burton was in custody at the time she was interviewed, once Burton was placed in the interview room she was no longer shackled. In addition, she was not subjected to violence and the agents' demeanors were calm during the questioning and were not coercive. Burton was also not subjected to any coercive pressure in that the FBI agents did not accuse her of any criminal activity that they were investigating or had any interest in that activity which she had committed. Accordingly, the Court finds that Burton's statements were voluntary.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress, ECF No. 14, is hereby **GRANTED**.

**IT IS SO ORDERED.**

Dated:  January 5, 2017

Hon. Gonzalo P. Curiel
United States District Judge

23